**Randall KNIGHT, Plaintiff,**

v.

**CITY OF NEW YORK, New York City Police Department, Capt. Glen D'Ottavio (individually and in his official capacity), Capt. Charles Stravalle (individually and in his official capacity), Lt. Christopher Dennis (individually and in his official capacity), Lt. Thomas Commins (individually and in his official capacity), Lt. Gregory Mangini (individually and in his official capacity), Robert Oldham (individually and in his official capacity), Sgt. James Cavuto (individually and in his official capacity), Sgt. William Rostkowski (individually and in his official capacity), Defendants.**

No. 02 CIV. 3614(DC).

United States District Court,
S.D. New York.

Feb. 20, 2004.

490

Robert H. Spergel, Esq., Garden City, NY, for Plaintiff.

Davis & Gilbert, LLP by Guy R. Cohen, Esq., Jane S. Friedman, Esq., Raphael Lee, Esq., New York City, for Defendants.

CHIN, District Judge.

In this civil rights case, plaintiff Randall Knight, a Police Officer in the New York City Police Department (the "NYPD"), alleges that his employer and supervisors unlawfully retaliated against him for filing a sexual harassment complaint against a coworker with the NYPD's Office of Equal Employment Opportunity ("OEEO"). The alleged retaliation took the form of negative performance evaluations, unwarranted or excessive disciplinary action, and excessive monitoring during his scheduled tour of duty. Defendants, the City of New York, the NYPD, Captain Glen D'Ottavio, Captain Charles Stravalle, Lieutenant Christopher Dennis, Lieutenant Thomas Commins, Lieutenant Gregory Mangini, Lieutenant Robert Oldham, Sergeant James Cavuto, and Sergeant William Rostkowski, (collectively "defendants"), move for summary judgment pursuant to Fed. R.Civ.P. 56.

Defendants present substantial evidence that the disciplinary actions against Knight and the subpar performance evaluations he received in the years following his OEEO complaint were either too minor to support a retaliation claim, or for legitimate, non-retaliatory reasons. Knight has failed to respond with sufficient evidence to generate an issue of material fact for trial. Accordingly, and for the reasons set forth below, defendants' motion for summary judgment is granted and the complaint is dismissed.

### STATEMENT OF THE CASE

#### I. The Facts

The undisputed facts are as follows:

## A. *Plaintiff's Unit*

Knight has been a NYPD Police Officer since 1984. (Plt. Dep. at 11). In September 1997, Knight transferred to the NYPD's Applicant Processing Division ("APD"). (*Id.* at 12). APD interviews and conducts background checks on applicants for positions as police officers, school safety agents, traffic enforcement agents, and Department of Environmental Protection officers. (*Id.* at 72). Each APD investigator evaluates the candidates assigned to him or her and creates a case review sheet reflecting initial interviews and a background check of the candidate. (*Id.*). Investigators then submit their case review sheets to their supervisor for approval. (Dennis Dep. at 18).

## B. *The Harassment Complaint*

In January 1999, Knight notified Sgt. John Costello that he was being sexually harassed by an APD civilian investigator, Brenda Idris. (Plt. Dep. at 496). Costello immediately referred Knight's complaint to the OEEO, but Knight subsequently elected to have APD investigate the complaint under OEEO oversight. (D'Ottavio Dep. at 17). In March 1999, while the outcome of the investigation was pending, APD transferred Idris to a different floor of the APD office after Knight complained that she continued to harass him. (Plt. Dep. at 493–94). To avoid further interaction and conflict, neither Knight nor Idris was permitted on the floor where the other worked without permission and an escort. (*Id.* at 480, 479–80, 487; Rostkowski Dep. at 25). Knight was never denied permission to go to Idris's floor. (Plt. Dep. at 484–85).

On September 17, 1999, the OEEO notified Knight by letter that his complaint against Idris was substantiated. (*Id.* at 491). Once the Police Commissioner's Office had approved discipline for Idris, she was transferred to the APD's Brooklyn office in December 1999. (*Id.* at 482; Friedman Decl. Exh. G). Knight was thereafter permitted to go to all floors of his building without permission or an escort. (Plt. Dep. at 482).

## C. *Knight's Performance Evaluations Following the Harassment Complaint*

Because of several OEEO complaints and low productivity at the Brooklyn office, in March 1999 three supervisors from the Queens APD office were transferred to the APD's Brooklyn office, and three supervisors were transferred from Brooklyn to Queens. (Dennis Dep. at 13; Plt. Dep. at 93, 508–09). Sgt. Mary Dumphrey became Knight's squad sergeant and immediate supervisor. (Rostkowski Dep. at 18). In July 1999 Rostkowski was transferred to the Queens office and replaced Dumphrey as Knight's supervisor. (*Id.* at 10).

Problems between Knight and Rostkowski soon developed. According to Rostkowski, Knight ignored his instructions on completing certain tasks and disregarded deadlines. (*Id.* at 56–57). Rostkowski also noticed that frequently Knight submitted case review sheets with missing information and that his work required corrections significantly more often than the other investigators Rostkowski supervised. (*Id.* at 21; Commins Dep. at 135, 138). For example, one of the first case review sheets Knight submitted to Rostkowski contained a major error that nearly resulted in the mistaken hiring of a candidate. (Rostkowski Dep. at 22).

### 1. *The 1999 Evaluation*

In or about March 2000, Rostkowski met with Knight to give him a formal performance evaluation for 1999. (*Id.* at 30, 57–8; Plt. Dep at 348–49). Rostkowski rated Knight "below competent." (Friedman

Decl. Exh. J). The 1999 evaluation reflected Sgt. Rostkowski's belief that Knight had "the potential of being a competent investigator," but that Knight's casework was "never neatly prepared" and was "usually missing pertinent information." (*Id.*). The evaluation also reflected his intention to increase monitoring Knight for performance reasons. (*Id.*). Knight declined his option to appeal the 1999 evaluation. (Plt. Dep. at 358; Friedman Decl., Exh. J).

## 2. The 2000 Evaluation

In April 2001, Rostkowski met with Knight to discuss Knight's annual performance for 2000. (Plt. Dep. at 389–90; Friedman Decl. Exh. K(1)). Rostkowski showed Knight a draft review sheet that again rated Knight "below competent" for the year. The evaluation reflected Rostkowski's belief that Knight's performance in investigating and completing his cases suffered due to Knight's failure to "put forth enough time or effort into his investigations." (Friedman Decl. Exh. K(1)). Although Knight's performance in 2000 had improved from the previous year, Knight's "work [was] not the caliber of a veteran investigator." (*Id.*). Knight refused to sign the evaluation because he disagreed with Rostkowski's use of definitive terms such as "always" and "never" when describing the negative aspects of his performance. (Plt. Dep. at 392).

## D. Knight Appeals the 2000 Evaluation and is Assigned a Different Supervisor

Knight advised Rostkowski that he would appeal the evaluation and asked for a transfer from Rostkowski's squad. (*Id.* at 396–97, 401). Several days later, Knight submitted a memorandum stating the reasons for his appeal. The memorandum concluded with Knight's opinion that the negative emphasis in the evaluation indicates "that it is based on a personal and not a Supervisor/Employee level as required by guidelines." (Friedman Decl. Exh. Q(2)).

After submitting the appeal memorandum, Knight met with Captain Stravalle and Lieutenant Commins about the evaluation. (Plt. Dep. at 441). Stravalle read to Knight from a list of incidents concerning Knight over the prior two years. (*Id.* at 406). The list's entries documented instances of Knight submitting case review sheets with numerous discrepancies and errors, Knight's name being entered on the minor violations log for failing to wear a tie after being instructed twice, and numerous instances of Knight failing to sign in and out for duty properly. (Friedman Decl. Ex. P). After giving Knight a copy of the list, Stravalle advised him that he would be transferred out of Rostkowski's squad as he had requested, and that his new supervisor would evaluate him after a three-month interim period. (Plt. Dep. at 406).

As a result of the appeal, Rostkowski revised the evaluation to reflect that Knight's work is "usually sloppily prepared" instead of "is always sloppily prepared." (Friedman Decl. Exh. K(2)).

## 1. Knight's Job Performance Under the New Supervisor

In May 2001, Sgt. Mary Elizabeth Tria assumed direct supervisory responsibility over Knight. (Tria Decl. ¶ 2). At Stravalle's request, Tria kept notes to document both positive and negative aspects of Knight's performance. (*Id.* ¶ 3). During the interim period, Tria documented 16 unsatisfactory performance incidents by Knight. (*Id.* ¶ 4).

For example, on May 24, 2001, Knight submitted a case review sheet that was missing the candidate's employment veri-

fication. Knight had been instructed three times to correct the problem and lied to Rostkowski about the status of the case, saying that Tria had signed off on it when she had not. (*Id.* ¶ 5). On several occasions, Knight incorrectly calculated a candidate's age. (*E.g., id.* ¶ 6). On one occasion the miscalculation disqualified an otherwise eligible candidate. (*Id.* ¶ 9). Tria also documented several instances in which Knight changed his own tour of duty without authorization, or simply showed up to work late. (*Id.* ¶ 10).

The positive incidents Tria documented during the interim period concerned Knight cleaning an office refrigerator, his submission of a list of outstanding cases in a timely manner, and his occasional compliance with the requirement that he request tour changes in advance. (*Id.* ¶ 12).

### 2. The Interim Evaluation

In August 2001, Tria gave Knight an evaluation for the interim period rating him "below competent." (Friedman Decl., Exh. L(2)). On the evaluation, Tria wrote that Knight's work "usually needs correcting or clarifying," and that Knight was "somewhat lax in performing the duties, tasks and functions of an experienced investigator." (*Id.;* Plt. Dep. at 455).

Prior to preparing the evaluation, Tria was told by Commins that if she did not give Knight a negative evaluation, "it would make [Rostkowski] look foolish." (Tria Dep. at 54). Commins also told her, "it is your evaluation ... you do what you want." (*Id.*).

### 3. Knight's Evaluations Improve

In January 2002, Tria evaluated Knight's performance for 2001 and gave him a rating of "above competent." The evaluation reflected Tria's belief that Knight's case management skills had improved and that he had "developed a more positive attitude towards his work, peers and supervisors." (Friedman Decl. Exh. M)..

In January 2003, Tria evaluated Knight's performance for 2002 and rated him as "competent." (Friedman Decl. Exh. N).

### E. Knight's Disciplinary Record for NYPD Patrol Guide Violations

Knight was cited repeatedly before and after his harassment complaint for minor rule violations and was disciplined for more significant violations of NYPD rules on several occasions following his harassment complaint.

### 1. Minor Violations

### i. Entries on Minor Violations Log

In 1999, Knight was entered in the minor violations log on three separate occasions. On August 3 and November 3, 1999, Knight was cited for failure to wear a tie and for "improper business attire." (Plt. Dep. at 171, 173). On November 8, 1999, Knight was entered into the minor violations log for "improperly answering a Department telephone." (*Id.*).

In 2000, Knight received two minor violations. The first violation occurred on January 11, for "failing to wear a tie after previously being instructed to do so." (Friedman Decl. Exh. P). Knight does not recall the January 11 violation, but acknowledged that he was spoken to on numerous occasions for failing to wear a tie. (Plt. Dep. at 125, 356, 417). On March 13, 2000, Knight was cited for "being off post and in the lounge." (Friedman Decl. Exh. P).

### ii. Knight Signed in Late for Duty

Police officers in APD are required to sign a movement log at the start of their scheduled tour of duty, at the end of their

tour, and whenever they leave for a meal or break. (Plt. Dep. at 102–02; Cavuto Dep. at 52–3). In March 1999, on Sgt. Buscemi's first or second day at APD, Knight arrived several minutes late. (Plt. Dep. at 506–07). Buscemi required Knight to complete a "lost time" report so that the minutes he had missed from work would be deducted from his accrued time off. (*Id.* at 506)

Sgt. Cavuto sometimes signed the movement log so that if Knight or anyone else arrived late, they would have to sign in after Cavuto's entry. (*Id.* at 592). On May 30, 2000, Knight signed in late because Cavuto had signed in before his arrival. (Friedman Decl. Exh. B, at 3). Knight was required to submit a lost time report for ten minutes. (Plt. Dep. at 592).

### 2. Disciplinary Action Against Knight

Knight was subject to disciplinary action by the NYPD on three occasions following his complaint. One of the disciplinary incidents was the result of Knight's sloppy appearance while on duty at the Israeli day parade. (Friedman Decl., Exh. T; Plt. Dep. at 209). Knight does not allege that the disciplinary action resulting from this incident was retaliatory. Accordingly, I consider only the two remaining incidents as they relate to the motion for summary judgment.

#### i. Destruction Of NYPD Property

In February 1999, Knight received a wallet-sized "NYPD DEPARTMENT VALUES" card.[1] In August 1999, Knight placed the card in a shredder and destroyed it. (Plt. Dep. at 194–95). Knight was docked two vacation days for destruction of NYPD property. (*Id.* at 206).

#### ii. Failure to Safeguard Firearm

In May 2000, Knight was involved in a family dispute with his brother, Michael Knight ("Michael"). Knight is the administrator of his mother's estate, and the dispute concerned Michael's right to enter a house owned by the estate. (*Id.* at 240). Michael arrived at the house with a court order granting him access to the house and accompanied by Sgt. Doarse from the 113th Precinct. (*Id.* at 241–44). Despite Knight's request that they wait for his attorney to arrive at the scene, Doarse allowed Michael to enter the house. (*Id.* at 242–43). During the ensuing discussion between Doarse and Knight, Doarse learned that Knight had left his firearm in his car and reported it to the Captain on duty at the 113th Precinct. (*Id.* at 247). Knight was subsequently disciplined for failing to safeguard his weapon.[2] While represented by an attorney, Knight signed a plea agreement on March 20, 2001 accepting the disciplinary action for the incident. (Plt. Dep. at 330).

### II. Procedural History

On or about June 30, 2001, Knight filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Compl.¶ 6). On or about

---

1. The NYPD Values were expressed on the card as follows: "Protect the lives and property of our fellow citizens and impartially enforce the law; Fight crime both by preventing it and aggressively pursuing violators of the law; Maintain a higher standard of integrity than is generally expected of others because so much is expected of us; Value human life, respect the dignity of each individual and render our services with courtesy and civility; Remember to treat people in the same way you would expect to be treated." (Friedman Aff. Exh. R).

2. NYPD Patrol Guide Procedure Number 204–08 requires officers to "Safeguard weapons at all times" and specifically prohibits members of the NYPD from leaving their "firearm in an unattended motor vehicle." (Friedman Aff. Exh. U).

March 6, 2002, the EEOC issued Knight a right-to-sue letter. (*Id.*).

On May 10, 2002, Knight brought this complaint asserting claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and 42 U.S.C. §§ 1983 and 1985.

On February 25, 2003, the claims against defendants Rudolph Giuliani and Bernard Kerik were dismissed with prejudice.

By letter to the Court dated July 11, 2003, Knight withdrew his claims based on racial discrimination, and any other claims to the extent they alleged discrimination on account of race or national origin. His remaining claims allege hostile work environment, unlawful retaliation, denial of Equal Protection rights, violation of Knight's First Amendment right to free speech, and conspiracy to deprive Knight of his constitutional and civil rights.

Before the Court is defendants' motion for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor. *See id.*

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *Nat'l Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

### II. Application

#### A. Retaliation Claims

Courts employ the same analytical framework when considering retaliation claims brought pursuant to Title VII, NYSHRL, and NYCHRL. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000)(citing cases). On a motion for summary judgment, "(1) plaintiff must demonstrate a prima facie case of retaliation, (2) defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the complained of action, and (3) if the defendant

meets its burden, plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." *Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998).

To establish a prima facie case of retaliation, Knight must demonstrate that "(1) [he] was engaged in protected activity; (2) the employer was aware of that activity; (3) [Knight] suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir.1998); *see also Reed v. Lawrence*, 95 F.3d 1170, 1178 (2d Cir.1996).

The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See* 42 U.S.C. § 2000e–3; *see also Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134–35 (2d Cir.1999). Informal as well as formal complaints constitute protected activity. *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). Moreover, to establish that his activity is protected, Knight "need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Id.* at 209; *see also Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989).

An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (internal quotation omitted). " 'To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Id.*

(quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). An adverse employment action is not defined "solely in terms of job termination or reduced wages and benefits[.] ... [L]ess flagrant reprisals by employers may indeed be adverse." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997). At the same time, however, " 'not every unpleasant matter short of [discharge or demotion] creates a cause of action' for retaliat[ion]." *Id.* (quoting *Welsh v. Derwinski*, 14 F.3d 85, 86 (1st Cir.1994)). There are no bright-line rules in applying this standard. *Wanamaker*, 108 F.3d at 466. Courts must examine closely "each case to determine whether the challenged employment action reaches the level of 'adverse.' " *Id.*

A plaintiff may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or ... (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000); *see also Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993).

It is undisputed that Knight engaged in a protected activity when he complained in 1999 that he was being sexually harassed. It is also undisputed that his supervisors were aware of the complaint. Knight, however, cannot make out a prima facie case of retaliation because no reasonable juror could find that the allegedly adverse employment actions were causally related to his harassment complaint. Indeed, defendants consistently demonstrate legitimate reasons for the allegedly retaliatory conduct that Knight fails to rebut, and no reasonable jury could conclude that these asserted reasons were pretextual. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768–69 (2d Cir.1998). Accord-

ingly, defendants' motion for summary judgment is granted in this respect and Knight's retaliation claims are dismissed.

### 1. *Adverse Employment Action*

■ "[D]isciplinary memoranda and evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotions, wages or termination." *Regis v. Metro. Jewish Geriatric Ctr.*, 97 Civ. 0906, 2000 WL 264336, at *8, 2000 U.S. Dist. LEXIS 2215, at *21 (S.D.N.Y. Jan. 11, 2000). Here, the negative performance evaluations arguably have no impact on Knight's salary or prospects for promotion.[3] There was testimony that negative evaluations could have a negative impact on career advancement and transfer opportunities, but Knight testified that he intends to retire as soon as he is eligible for his pension in March 2004, and there is no evidence in the record that he ever sought or intends to seek a transfer from APD. (Commins Dep. at 12–14, Stravalle Dep. at 45; Plt. Dep. at 70–71).

Although Knight's particular circumstances create the likelihood that the negative performance evaluations did not constitute adverse action here, I need not decide the issue because Knight fails to establish a causal link between his harassment complaint and the adverse employment action. Thus, even assuming that the negative performance evaluations did amount to adverse action, Knight's retaliation claim must fail.

### 2. *Causal Connection*
#### a. *Performance Evaluations*

■ A reasonable jury could only conclude that there was no causal connection between Knight's complaint and his performance evaluations.

First, the record shows that Rostkowski and Tria each had legitimate, nonretaliatory reasons for giving Knight poor performance evaluations. Both testified to numerous occasions of having to return work to Knight due to mistakes and missing information. (Rostkowski Dep. at 21–22, 28, 30, 57–58; Tria Decl. ¶¶ 4–6, 9). Both testified to Knight's negative attitude toward his supervisors and repeated failure to dress properly for work. (Rostkowski Dep. at 56–57; Friedman Decl., Exh. L(1)). Indeed, Knight admitted that the negative aspects of his performance cited by Rostkowski in the 1999 evaluation were true. (*E.g.*, Plt. Dep. at 335, 357). Hence, a reasonable jury could only conclude that the supervisors' negative comments were well-founded.

■ Second, Knight received the first "below competent" evaluation more than a year after he first complained that he was being harassed and before he filed his EEOC complaint. (Plt. Dep. at 348–49). "Mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action [can be accepted as] sufficient evidence of causality ... [but] the temporal proximity must be very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). The temporal sequence here fails as a matter of law to establish that Knight's harassment complaint prompted the negative evaluations. *Clark County Sch. Dist.*, 532 U.S. at 273–74, 121 S.Ct. 1508 (holding that action taken 20 months after protected activity

---

**3.** Knight's salary is determined by a collective bargaining agreement between his union, the Patrolman's Benevolent Association, and the NYPD. (Plt. Dep. at 18). To be eligible for a promotion in the NYPD, Knight must pass the relevant exam to be eligible for a promotion. Knight has failed the Sergeants exam four times and does not allege that his exam results have anything to do with his retaliation claim. (*Id.* at 532–33).

suggests no causality and citing with approval cases that held that intervals of three and four months were too long).

Third, Knight's claim simply does not make sense. No reasonable jury could find that Knight's supervisors, who were not even in his group at the time of the underlying incident, as well as a superior officer, the unit commander, and the Captain of the APD all would have given him negative performance evaluations just because he complained about sexual harassment not by another police officer, but by a civilian employee—particularly where the complaint was substantiated.

Knight makes two arguments in an effort to conjure up an issue of fact as to causation. He argues that the retaliatory intent behind the negative performance evaluations is revealed by Tria's testimony that Commins told her "if [she] didn't give Randall Knight a below standards evaluation [for the rating period May 21, 2001 to August 7, 2001] it would make it look like sergeant Rostkowski was the one who had the problem and it would make him look foolish." (Tria Dep. at 54). This testimony does not generate an issue of material fact for trial. Despite being encouraged to change her evaluation of Knight, Tria testified that the only change she made was the addition of a paragraph of "background information" regarding Knight's history of poor performance evaluations. (*Id.* at 51; Friedman Decl. Exh. L(2)). Most importantly, she testified that her evaluation of Knight was based solely on her perception of his work. (Tria Dep. at 57–58).

Knight also argues that his expert's report creates a factual issue.[4] Not so. The report is based largely on the expert's interpretation of the factual record. Accordingly, the report, even if admitted into evidence, would not alter the factual record sufficiently to enable a reasonable juror to find that the alleged retaliation was causally related to Knight's harassment complaint.

### b. *Enforcement of Minor Rules*

■ Knight also claims that defendants retaliated against him by closely monitoring his behavior following his harassment complaint and enforcing trivial rule violations. For example, in January 2001 Knight was told that if he wanted to attend the funeral of a colleague's father, he would have to submit a lost time report even though other officers were allegedly permitted to attend the funeral on "job time." (*Id.* at 537). Knight also cites a number of examples of enforcement of minor infractions. (*Id.* at 107–09).

Knight's claim that he was required to attend the funeral on his own time stands out from the other allegations because he specifically claims that he was treated differently from other officers.[5] There is no specific evidence, however, to support his allegation. Indeed, Knight admitted in his deposition that he does not know for certain whether any other officers were required to submit lost time reports for attending the funeral, but that he "could find out." (*Id.* at 539). The materials accompanying Knight's opposition to summary judgment, however, did not include any evidence to substantiate this claim. Thus,

---

**4.** Defendants have moved to exclude the report of Knight's expert witness, Adam Alvarez. There is no need for the Court to rule on this motion, however, because even crediting the expert report, Knight's claim cannot withstand summary judgment.

**5.** At one time Knight did broadly allege that he was treated differently from other white officers and was sometimes singled out for not wearing a necktie when other non-minority officers were also not wearing neckties (Plt. Dep. at 503), but he later withdrew all of his claims and allegations related to race.

the only evidence that Knight was treated differently from the other officers attending the funeral is his wholly unsubstantiated allegation.

Defendants have a justification for each minor disciplinary action against Knight: his admitted and repeated violations of NYPD rules. (*E.g., id.* at 108, 171, 173, 415, 416–17, 506, 588)(Knight's deposition testimony where he admits to incidents of arriving late, not wearing proper business attire, signing someone else onto the movement log, improperly answering a precinct telephone, and failing to sign out from duty). Knight cites no evidence that he was treated differently from other similarly situated officers. The only evidence that these incidents are related to his harassment complaint is temporal proximity. Many of the incidents, however, occurred more than a year after he filed his complaint and are therefore too remote to enable a jury to infer a causal relationship.

### c. *Disciplinary Action*

■ The disciplinary action against Knight for shredding his "NYPD Values" card and for failing to safeguard his firearm followed his initial harassment complaint against Idris by six months and fifteen months, respectively. (Friedman Decl. Exh. R, Exh. S). Knight has presented no evidence whatsoever to support his claim that these disciplinary actions were in any way related to his harassment complaint. Knight admits his culpability in both these incidents. Again, the sequence of events is the primary evidence of a retaliatory motive. The temporal proximity of the disciplinary action is so remote from the protected activity, however, that no reasonable jury could infer retaliation.

### d. *Overtime and Mandatory Detail Assignments*

■ Even if Knight could somehow establish that any loss of overtime was an adverse employment action, there is little evidence to support his claim that it was related to his harassment complaint. Although Tria testified that she was instructed not to give Knight overtime in 2001, Knight cites no evidence that the instruction was in any way related to Knight's harassment complaint. Indeed, Knight admits that performance is a legitimate consideration for overtime assignments (Plt. Dep. at 38–39), and it is undisputed that during the relevant time period Knight's performance evaluations were negative. Based on these facts and the more than two years between Knight's initial harassment complaint and the alleged loss of overtime, no reasonable juror could infer a causal connection between them.

### e. *Excessive Monitoring*

■ Knight has adduced no evidence during discovery to support a claim that restricting his access to Idris's floor was retaliatory. The evidence reflects that the movements of Idris and Knight were restricted while Knight's harassment complaint was under investigation as an interim measure to minimize opportunities for further conflict. (*Id.* at 479–80, 487; Rostkowski Dep. at 25; Friedman Decl. Exh. F). Once the complaint was substantiated, Idris was transferred to an office in a different borough, and Knight's unrestricted access to the sixth floor was restored.

Clearly, the restriction from the sixth floor was related to the harassment complaint, but the circumstances surrounding the restriction reveal that it was an appropriate effort to minimize contact between Knight and Idris during the pendency of his harassment complaint. Under these circumstances, no reasonable juror could hold that Knight's temporarily restricted

access to the sixth floor was prompted by a retaliatory motive.

Considering the evidence as a whole, and resolving all conflicts in the evidence and drawing all reasonable inferences in Knight's favor, I conclude that no reasonable jury could find that any adverse employment action suffered by Knight was in retaliation for his harassment complaint.

Knight is obliged to present sufficient evidence to support a finding by a reasonable jury. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)(to defeat summary judgment, plaintiff is obliged not just to produce "some" evidence, but must produce sufficient evidence to support a rational jury verdict in her favor). Here, the record is simply devoid of evidence sufficient to connect Knight's harassment complaint to the allegedly adverse employment action. I conclude that no reasonable jury could find that Knight was the victim of unlawful retaliation. Accordingly, the motion for summary judgment is granted as to Knight's retaliation claims.

### B. Hostile Work Environment Claim

 Knight alleges that he was the victim of a "persistent and pervasive practice of harassment by restrictions, threats of transfers, work assignments, denial of overtime, time off, unwarranted investigations, and disciplinary action" in retaliation for his harassment complaint. (Compl.¶ 84). To prevail on the hostile work environment claim under Title VII, Knight must show that his workplace during the relevant time frame was " 'permeated with discriminatory intimidation, ridicule and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment.' " *Torres v. Pisano*, 116 F.3d 625, 630–31 (2d Cir.1997)(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

The work environment must have been "objectively' hostile or abusive," and Knight must have "subjectively perceived" the environment to have been abusive. *Id.* at 21, 114 S.Ct. 367. Additionally, Knight must demonstrate that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996). Of course, for Knight to prevail he must demonstrate that this hostile environment was motivated by an intent to retaliate against him for filing the complaint against Idris.

 Assuming Knight subjectively perceived his work environment to be abusive, to establish an objectively hostile work environment he must show that the allegedly retaliatory incidents "were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000). A jury would consider the nature and severity of the allegedly hostile conduct, and whether it unreasonably interfered with Knight's work performance. *Harris v. Forklift*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

 Based on the totality of the circumstances, no reasonable juror considering the claim could find that Knight's work environment was objectively hostile or abusive as a matter of law. Knight relies on the same operative facts underlying his retaliation claims to support his hostile work environment claim. His retaliation claims fail, however, because the incidents are too remote from Knight's harassment complaint or because Knight has failed to show that the allegedly adverse employment action was anything other than legitimate actions taken by his supervisors. Accordingly, defendants' motion for summary judgment as to this claim is granted.

## C. *The Section 1983 Claims*

█ Section 1983 provides a cause of action where (1) defendants acted under color of state law; and (2) defendants' actions caused a plaintiff to suffer a denial of his constitutional rights or privileges. *Eagleston v. Guido,* 41 F.3d 865, 872 (2d Cir.1994).

█ Knight couches his initial Section 1983 claim for retaliation as a violation of his Equal Protection rights under the 14th Amendment. "Claims of retaliation are not cognizable under the Equal Protection Clause because Title VII provides an exclusive remedy for such claims." *E.g., De La Cruz v. Guilliani,* No. 00 Civ. 7102(LAK), 2002 U.S. Dist. LEXIS 19922, *34 (S.D.N.Y. Aug. 23, 2002). Accordingly, the claim is dismissed.

█ To establish a First Amendment retaliation claim under Section 1983, Knight must establish that (1) the speech at issue was protected; (2) he suffered an adverse employment action; (3) there was a causal connection between the protected speech and the adverse employment action. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

█ To constitute protected speech, the speech at issue must involve a matter of public interest. *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

Knight's complaints of sexual harassment and discrimination were related solely to his employment status and do not amount to protected speech on a matter of public interest. *Saulpaugh v. Monroe Cmty. Hosp.,* 4 F.3d 134, 143 (2d Cir.1993). Accordingly, Knight's First Amendment claim is dismissed.

## D. *The Section 1985 Claim*

█ Knight's sixth claim for relief alleges that defendants conspired to deprive him of his constitutional and civil rights in violation of 42 U.S.C. § 1985(3). To establish a claim under Section 1985(3) Knight must establish: (1) the existence of a conspiracy; (2) for the purpose of depriving him, either directly or indirectly, of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) injury in his person or property or deprivation of any right of a citizen of the United States. *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993)(citing *United Brotherhood of Carpenters & Joiners of America v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)). Furthermore, the conspiracy must be motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *United Brotherhood,* 463 U.S. at 829, 103 S.Ct. 3352.

█ Section 1985(3) provides a civil cause of action only when some other defined federal right has been violated; it creates no substantive rights. *See Great American Federal Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Because none of Knight's remaining claims in this case can withstand the motion for summary judgment, there is no basis on which Knight

can pursue a Section 1985(3) claim. *Walker v. New York City Transit Auth.*, 2001 WL 1098022, *14, 2001 U.S. Dist. LEXIS 14569, *39 (S.D.N.Y. Sept. 19, 2001). Accordingly, summary judgment is granted to defendants dismissing Knight's claims of civil rights conspiracy under 42 U.S.C. § 1985.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted as to all claims. The complaint is dismissed as to all defendants, with prejudice. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.