OPINION and ORDER
 

 KOELTL, District Judge.
 

 This is an employment discrimination action brought by the plaintiff, Paula N. Hill, against two defendants: Citibank, N.A. (“Citibank”) d/b/a Citigroup Asset Management and named in this action as Citibank Corp.; and Advantage Staffing, Inc. (“Advantage”), now known as Advantage Human Resourcing. The plaintiff was employed by Advantage, a staffing agency, and was assigned to work as a temporary employee at Citibank from around December 1997 to April 1999. The plaintiff alleges that she was subjected to a hostile work environment by a supervisor based on her race and that her assignment at Citibank was terminated in retaliation for her complaining about the alleged harassment to Citibank’s Human Resources Department.
 

 The plaintiff brought claims for a hostile work environment based on racial harassment and for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e
 
 et seq.,
 
 as well as under the New York State Human Rights Law (“NYSHRL”), N.Y. Exec. Law § 296, and the New York City Human Rights Law (“NYCHRL”), N.Y.C. Admin. Code § 8-107. The defendants moved for summary judgment pursuant Fed.R.Civ.P. 56(c) dismissing the plaintiffs claims on the grounds that they are time barred and that they should be dismissed on the merits. While the motions were pending, the claims against Advantage were settled and dismissed with prejudice. This Opinion and Order, therefore, addresses only the motion by Citibank for summary judgment dismissing the claims against it.
 

 I.
 

 The following facts are undisputed unless otherwise noted.
 
 [1]
 
 The plaintiff was an employee of Advantage, which furnishes temporary staffing services; in or around spring of 1998, the plaintiff was placed as a temporary clerical employee with Citibank’s Asset Management Operations Group (the “Operations Group” or the “Group”).
 
 (See
 
 Compl. Count One ¶ 1; Citibank’s Statement of Material Facts Pursuant to Local Rule 56.1 (“Def.’s Rule 56.1 Stmt.”) ¶ 1; Pl.’s Statement of Material Facts Pursuant to Local Rule 56.1 (“Pl.’s Rule 56.1 Stmt.”) ¶ 1.) The Group’s primary function was to provide logistical support in connection with office and employee relocations. (Def.’s Rule 56.1 Stmt. ¶2.) At the time, the Operations Group was headed by Jack Carter, who was a Citibank vice president.
 
 (See id.
 
 ¶¶ 3^4.)
 

 The plaintiff was brought into the Group specifically to provide administrative assistance to other Vice Presidents, including Katie O’Connell, McDonald Harewood, Donald Dromm, and John Remmert.
 
 (Id.
 
 ¶ 8.) At the time that the plaintiff worked in the Group, it was in the process of relocating offices from New York City to Stamford, Connecticut.
 
 (Id.
 
 ¶ 9.) In or around June 1998, the plaintiffs duties shifted and she began providing support
 
 *DXI
 
 primarily, although not exclusively, for Ms. O’Connell, who was responsible for a project involving Y2K (the “Y2K Project”).
 
 (Id.
 
 ¶ 10.) The plaintiff was initially paid twenty dollars per hour
 
 (id.
 
 ¶ 5), but upon being reassigned to that project, her pay was increased to thirty dollars per hour, making her the highest compensated temporary clerical employee in the Group
 
 (id.
 
 ¶ 12).
 

 In July 1998, a new vice president, Holly Miller, was assigned to the Operations Group, having recently transferred from Citibank’s London office.
 
 (Id.
 
 ¶ 13.) The plaintiff does not claim to have experienced any harassment through June 1998, but from Ms. Miller’s first day at the New York office, the work environment allegedly began to change. That first day, the plaintiff claims, Ms. Miller told a story about former college classmates who were African American and would put Vaseline in their hair to straighten it.
 
 (See id.
 
 ¶ 15.) The plaintiff alleges that from July 1998 through at least February 18, 1999, Ms. Miller subjected her to hostile treatment that allegedly involved Ms. Miller being loud, rude, and vicious toward the plaintiff
 
 (see id.
 
 ¶ 18-19), and also involved Ms. Miller making inappropriate comments directed at the appearance, language, or customs of African Americans.
 
 (See
 
 Compl. Count One ¶ 2.)
 

 Specifically, the plaintiff claims that Ms. Miller on various occasions: stated that the plaintiff had a smooth complexion and complimented her hair style in front of another African American employee; related stories from her youth about feeling sorry for the “black kids” who were left around the public pool all day until their hair turned orange; expressed resentment for being called during dinner by campaigners for Rev. Al Sharpton; and made fun of the speech patterns of Jesse Jackson and blacks in general.
 
 (See
 
 Def.’s Rule 56.1 Stmt. ¶20; Pl.’s Rule 56.1 Stmt. ¶ 11.) There was also an incident, variously described by the parties, where Ms. Miller asked the plaintiff something to the effect of, “What do black people eat on Martin Luther King’s birthday?” The plaintiff, who claims to have been embarrassed and taken aback by the question, replied, “White people.”
 
 (See
 
 Def.’s Rule 56.1 Stmt. ¶ 20; Pl.’s Rule 56.1 Stmt. ¶ 11; Tr. of Dep. of Paula N. Hill (“Pl.Dep.”), dated Dee. 5, 2002, at 249-50.) The plaintiff also notes that a two-line excerpt regarding “The Life of a Slave” was sent to the communal printer used by her and another black employee, among other people.
 
 (See
 
 Def.’s Rule 56.1 Stmt. ¶¶ 20, 22; PL’s Rule 56.1 Stmt. ¶ 11; Decl. of Ira G. Rosenstein (“Rosenstein Decl.”) Ex. 1.)
 

 On or about February 13, 1999, the plaintiff complained about Ms. Miller’s behavior to Ms. O’Connell, who suggested that the plaintiff contact Vanessa Henley, a Human Resources representative at Citibank.
 
 (See
 
 Def.’s Rule 56.1 Stmt. ¶¶ 25-26.) On February 18, 1999, Ms. Henley, who is also African American, approached the plaintiff to discuss what the plaintiff believed to be a pattern of disrespectful and racially offensive behavior by Ms. Miller.
 
 (Id.
 
 ¶¶ 27-28.) Ms. Henley conducted an investigation, which included meeting with Ms. Miller and other Citibank vice presidents, including Mr. Harewood and Mr. Dromm.
 
 (See id.
 
 ¶ 34.) Ms. Henley concluded that Ms. Miller did not intend to hurt the plaintiffs feelings but that her behavior was unprofessional because it demonstrated poor judgment and did not relate to Citibank business in any way.
 
 (See
 
 Decl. of Vanessa Henley (“Henley Decl.”) ¶¶ 4-5.)
 

 On February 25, 1999, Citibank issued a “Final Warning” memorandum, drafted by the Human Resources Department and signed by Mr. Carter as director of the
 
 *DXII
 
 Group, informing Ms. Miller that her conduct had “compromised Citibank’s policy on diversity and [its] commitment to maintaining a work environment that is free of harassing, hostile, and intimidating or offensive behaviors.” (Rosenstein Decl. Ex. 2 (Mem. from Jack Carter to Holly Miller, dated Mar. 23, 1999 (“Warning Memo”);
 
 (see
 
 Def.’s Rule 56.1 Stmt. ¶¶ 43-45.) In addition to being warned that further inappropriate behavior would lead to corrective action up to and including termination, Ms. Miller was required to participate in a program on workplace diversity issues.
 
 (See
 
 Warning Memo; Def.’s Rule 56.1 Stmt. ¶ 44.) The warning was to remain in effect for six months.
 
 (See
 
 Warning Memo.) Ms. Miller protested her receipt of the warning letter; on March 5, 1999, Ms. Miller announced that she was resigning from Citibank, and her last day was April 1, 1999. (Def.’s Rule 56.1 Stmt. ¶¶ 46-47.)
 

 The plaintiff acknowledges that after meeting with Ms. Henley “[tjhings had calmed down” at the office, and she was generally no longer feeling hostility in the workplace.
 
 (Id.
 
 ¶ 41; PI. Dep. at 206.) The plaintiff, however, has raised two other incidents allegedly occurring a few weeks after her February 1999 meeting with Ms. Henley-although the plaintiff is unsure of exactly when either occurred. One alleged incident involved another vice president, Mr. Dromm. In response to the plaintiff telling a story about rude treatment by a token booth operator, Mr. Dromm allegedly called the plaintiff “a mean/nasty person” and asked her whether she pulled her switchblade out on the booth operator.
 
 (See
 
 Def.’s Rule 56.1 St. ¶¶ 23-24; PI. Dep. at 170-72.) The plaintiff feels the remark insinuated that “blacks carry switchblades.” (PI. Dep. at 171.) In addition, the plaintiff claims that she discovered the print-out regarding “The Life of a Slave” sometime after she spoke with Ms. Henley, although she has not stated more specifically when the excerpt was discovered.
 
 (See
 
 Hill Decl. ¶ 8.)
 

 Also in March 1999, at the same time as Ms. Miller was leaving Citibank, a transition was occurring where Mr. Carter-the Director of the Group-was preparing to retire and Richard Galligan was preparing to take over.
 
 (See
 
 Deck of Jack Carter (“Carter Deck”) ¶ 2; Deck of Richard Gal-ligan (“Galligan Deck”) ¶ 2;
 
 see generally
 
 Tr. of Dep. of Jack Carter (“Carter Dep.”), dated May 12, 2003, at 23-25, 30-41.) Mr. Carter’s last day was March 31, 1999, and Mr. Galligan assumed his full responsibilities in April 1999.
 
 (See
 
 Carter Deck ¶ 2; Galligan Deck ¶ 2.).
 

 Mr. Galligan has stated that upon assuming his position, he was issued a mandate to reduce expenses, and in response he reviewed several cost-cutting measures, including the reduction of temporary employee costs. (Galligan Deck ¶ 5.) Mr. Gal-ligan declared that in or around April 1999 he made the determination to discontinue the plaintiffs services without consulting anyone else.
 
 (Id.
 
 ¶¶ 5-8.) He decided to end the plaintiffs assignment because she was more highly compensated than any other temporary clerical employee in the Group, because the Group was being relocated to Connecticut, and because he felt the plaintiffs services were no longer necessary.
 
 (Id.
 
 ¶ 7.) He stated that at that time he was unaware of any complaints raised by the plaintiff or any action taken against Ms. Miller.
 
 (Id.
 
 ¶¶ 9-10.)
 

 Pursuant to the normal business practice, Citibank informed Advantage of its decision, and on April 20, 1999, Advantage notified the plaintiff that her assignment with Citibank was being terminated.
 
 (See
 
 Def.’s Rule 56.1 Stmt. ¶ 52.) April 19, 1999 was actually the plaintiffs final day at Citibank because she had taken personal leave starting that day.
 
 (See id.
 
 ¶ 53.)
 

 
 *DXIII
 
 The plaintiff disputes the circumstances surrounding her termination from Citibank and Advantage. She contends that Mr. Carter was involved in the decision to terminate her, and that he ordered the termination because he disagreed with the actions taken against Ms. Miller and because he allegedly resented the plaintiff for Ms. Miller’s subsequent resignation.
 
 (See
 
 PL’s Rule 56.1 Stmt. ¶¶ 28, 39-51.
 
 But see
 
 Def.’s Rule 56.1 Stmt. ¶ 51.) The plaintiff contends that the decision to terminate her was actually made on or around March 11, 1999 and that this decision was memorialized in an email from Ms. O’Connell to Mr. Galligan that was also sent to Mr. Carter, along with other vice presidents.
 
 (See
 
 Kraft Decl. Ex. 3.) The plaintiff further contends that she was replaced by another administrative assistant, although Citibank disputes this point.
 
 (Compare
 
 Pl.’s Rule 56.1 Stmt. ¶ 32,
 
 with
 
 Def.’s Rule 56.1 Stmt. ¶ 57.)
 

 The plaintiff filed charges of discrimination with the EEOC, and the EEOC issued a Notice of Charge of Discrimination to Citibank on July 12, 2000.
 
 [2]
 

 (See
 
 Rosen-stein Decl. Ex. 6.) The plaintiff was issued a right to sue letter by the EEOC on December 13, 2001 and filed suit against Citibank and Advantage on March 8, 2002.
 
 (See
 
 Compl.; Def.’s Rule 56.1 Stmt. ¶ 62.)
 
 [3]
 

 II.
 

 The standard for granting summary judgment is well established. Summary judgment may not be granted unless “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed. R.Civ.P. 56(c);
 
 see also Celotex Corp. v. Catrett,
 
 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);
 
 Gallo v. Prudential Residential Servs. Ltd. P’ship,
 
 22 F.3d 1219, 1223 (2d Cir.1994). “The trial court’s task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.”
 
 Gallo,
 
 22 F.3d at 1224. The moving party bears the initial burden of “informing the district court of the basis for its motion” and identifying the matter that “it believes demonstrate[s] the absence of a genuine issue of material fact.”
 
 Celotex, 477
 
 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and “only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.”
 
 Anderson v. Liberty Lobby, Inc., 477
 
 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 

 In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.
 
 See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
 
 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing
 
 United States v. Diebold, Inc.,
 
 369 U.S. 654, 655,
 
 *DXIV
 
 82 S.Ct. 993, 8 L.Ed.2d 176 (1962));
 
 see also Gallo,
 
 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.
 
 See Chambers v. TRM Copy Ctrs. Corp.,
 
 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with “specific facts showing that there is a genuine issue for trial.” Fed. R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and “may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.”
 
 Ying Jing Gan v. City of New York,
 
 996 F.2d 522, 532 (2d Cir.1993);
 
 see also Scotto v. Almenas,
 
 143 F.3d 105, 114-15 (2d Cir.1998).
 

 III.
 

 The defendant moves for summary judgment dismissing all of the plaintiffs federal claims as untimely for failure to file a charge with the EEOC in a timely manner-a precondition to suit under Title VII. It also moves for summary judgment dismissing the plaintiffs hostile work environment claims under state and local law as barred by the state and local law three-year statute of limitations.
 

 The plaintiff does not respond on this issue except to say that the Court rejected the time-bar arguments on the motion to dismiss and that “collateral estoppel” prevents the defendant from raising the issue on summary judgment. The “collateral estoppel” doctrine is plainly inapplicable, and even if the plaintiffs argument is interpreted as being based on “the law of the case” doctrine, it still has no merit. Advantage, but not Citibank, filed a motion to dismiss in which it argued that several of the claims, including both federal claims, were untimely. In an Order dated November 8, 2002, the Court denied the motion without prejudice to renewal, allowing evidence to be developed on such timeliness issues. There was no determination that the plaintiffs claims were timely.
 

 Because the plaintiff has not responded to the defendant’s motions in this respect, the plaintiff could be considered in default and the challenged claims could be dismissed on that basis alone. Nonetheless, the Court will analyze the substance of the statute of limitations arguments.
 

 A.
 

 Under Title VII, before bringing a claim in federal court, a New York plaintiff must file a charge with the EEOC within 300 days of the alleged discriminatory action.
 
 See
 
 42 U.S.C. § 2000e-5(e);
 
 Harris v. City of New York,
 
 186 F.3d 243, 247 (2d Cir.1999);
 
 Coffey v. Cushman & Wakefield,
 
 No. 01 Civ. 9447, 2002 WL 1610913, at *2 (S.D.N.Y. July 22, 2002);
 
 Nweke v. Prudential Ins. Co. of Am.,
 
 25 F.Supp.2d 203, 216 (S.D.N.Y.1998).
 
 [4]
 
 This statutory requirement effectively acts as a statute of limitations, and Title VII claims are barred by the failure to file a timely charge.
 
 See Van Zant v. KLM Royal Dutch Airlines,
 
 80 F.3d 708, 712 (2d Cir.1996).
 
 [5]
 

 
 *DXV
 
 The statute of limitations begins to run when each discrete discriminatory and retaliatory act occurs.
 
 See Nat’l R.R. Passenger Corp. v. Morgan,
 
 536 U.S. 101, 113-14, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002);
 
 Coffey,
 
 2002 WL 1610913, at *2 (noting that discrete acts falling outside of the statutory period cannot form basis for relief even if they are related to other actionable conduct that is otherwise not time barred). With respect to the plaintiffs Title VII retaliation claim, the limitations period began running on April 20, 1999, when her assignment with Citibank was terminated.
 
 (See
 
 Def.’s Rule 56.1 Stmt. ¶ 52.) Because hostile work environment claims involve the combination of multiple incidents and the continuing effect on the conditions of employment, a claim is timely if any act contributing to pattern of harassment occurred within 300 days of the filing of the EEOC charge.
 
 See Morgan,
 
 536 U.S. at 115, 122 S.Ct. 2061;
 
 Coffey,
 
 2002 WL 1610913 at *2. The defendant claims, based on the plaintiffs deposition testimony, that any harassment ceased in February 1999, after the plaintiff complained to the Human Resources Department. At the latest, the harassment must have ceased by April 19, 1999-the plaintiffs last day of work at Citibank.
 

 The peculiar problem in this case is that it is unclear when the plaintiff filed the EEOC charge against Citibank. The EEOC charge and accompanying statement are not signed and dated, and the EEOC’s records of the plaintiffs claim were destroyed in the tragic events of 9/11/01. The plaintiff does not remember when she filed the charge and has not been able to provide any testimony or evidence that sheds light on the situation.
 
 (See generally
 
 PI. Dep. at 233-44 (discussing steps taken before and in filing claim with EEOC).) Citibank, however, received a Notice of Charge dated July 12, 2000. It argues that the charge must have been filed no earlier than July 2, 2000 because the EEOC is statutorily required to provide notice to the employer within ten days of the charge being filed.
 
 See
 
 42 U.S.C. § 2000e-5(e)(l); 29 C.F.R. § 1601.14(a).
 

 Filing a timely EEOC Charge, exhausting administrative remedies, and filing suit within 90 days of receiving a right to sue letter are all statutory preconditions to filing a Title VII claim.
 
 See Jackson v. Seaboard Coast Line R.R. Co.,
 
 678 F.2d 992, 999-1000 & n. 7 (11th Cir.1982);
 
 Hladki v. Jeffrey’s Consol, Ltd.,
 
 652 F.Supp. 388, 392 (E.D.N.Y.1987). Under Rule 9(c) of the Federal Rules of Civil Procedure, a plaintiff may aver generally that all conditions precedent to suit have occurred, and any denial by the defendant must be made specifically and with particularity. Fed.R.Civ.P. 9(c);
 
 see Jackson,
 
 678 F.2d at 1010.
 
 [6]
 
 Once the defendant has challenged the condition precedent specifically and with particularity, the burden is on the plaintiff to prove that the condition
 
 *DXVI
 
 precedent was satisfied.
 
 See Jackson,
 
 678 F.2d at 1010;
 
 Hladki,
 
 652 F.Supp. at 393 n. 11;
 
 Mason v. Connecticut,
 
 583 F.Supp. 729, 733 (D.Conn.1984).
 

 In this case, the plaintiffs Title VII claims must be dismissed because the plaintiff would be'unable at trial to offer any admissible evidence that her charge was timely filed with the
 
 EEOC.
 
 The last of the allegedly discriminatory actions could have occurred no later than April 20, 1999, when the plaintiffs assignment at Citibank was terminated. The plaintiff would have had to meet the precondition of filing her EEOC charge within 300 days of that date. The defendant has argued in this motion specifically and with particularity that the charge is not timely because it could have been filed no earlier than July 2000, substantially after the 300-day period expired. Its argument is circumstantially supported by the undisputed receipt of notice on July 12, 2000 and the statutory requirements governing the EEOC. While it is not clear that the EEOC usually complies with the requirements governing notice, the EEOC letter sent to Citibank is the only piece of reliable and admissible evidence suggestive of the filing date.
 

 The only potential evidence suggesting that a claim was filed earlier than July 2000 is a copy of the EEOC charge and accompanying statement introduced by the other defendant, Advantage, on its now-moot summary judgment motion. That copy of the EEOC charge contains a “fax header” indicating that the charge had been faxed by the plaintiff on January 27, 2000 at around 1:00 a.m.
 
 (See
 
 Aff. of Beth Casey, dated May 22, 2003, Attachment.) The plaintiff testified in her deposition that she sent her charge to the EEOC by fax, although she was unable to testify as to when she sent the charge. (PI. Dep. at 244.) She has not submitted anything to the Court to authenticate the fax or the information with respect to the date and time printed on the fax, or to substantiate that the date and time were the date and time that the fax was sent to the EEOC. There is no basis for treating the “fax header” as reliable, and it would be inadmissible at trial as hearsay-an out of court statement offered for the truth of the matter asserted-that does not fall under an established exception.
 
 See
 
 Fed.R.Evid. 801(c), 802;
 
 Total Containment, Inc. v. Environ Prods., Inc.,
 
 921 F.Supp. 1355, 1370 (E.D.Pa.1995) (ruling that “the fax burn-in is insufficiently trustworthy ... to be admissible to establish the date of [the] document” and thus finding residual hearsay exception, Fed.R.Civ.P. 803(24), inapplicable), aff
 
 'd in part and vacated in part on other grounds,
 
 106 F.3d 427, 1997 WL 16032 (Fed.Cir.1997).
 

 Without the “fax header,” the plaintiff would be unable at trial to present any evidence that an EEOC charge was filed within the 300-day statutory period. The only evidence that could be admitted-the EEOC Notice of Charge sent to Citibank-tends to prove that the charge was filed in July 2000 and could not relate back to conduct that occurred in or before April 1999. Both federal claims are therefore untimely.
 

 B.
 

 Discrimination claims under the NYSHRL and NYCHRL are subject to three-year statutes of limitations for filing a complaint.
 
 See
 
 N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d);
 
 Coffey,
 
 2002 WL 1610913, at *3. The Complaint was filed on March 8, 2002, and thus, to be timely, the plaintiffs claims must have arisen for statute of limitations purposes after March 8, 1999. The retaliation claims are clearly timely under state and local law because the plaintiffs assignment
 
 *DXVII
 
 at Citibank did not end until April 20, 1999. With respect to the sexual harassment claims, the defendant argues that the plaintiff, at her deposition, acknowledged that harassment by Ms. Miller ceased after the plaintiff spoke with Ms. Henley on February 18, 1999. Indeed, based solely on acts specifically attributed to Ms. Miller, the hostile work environment claims are not timely under state and local law. The plaintiff, however, has also alleged that, after complaining to the Human Resources Department, she was sent an excerpt regarding “The Life of a Slave” and was harassed by Mr. Dromm. Neither allegation is sufficient for the plaintiff to argue that the period of harassment extended beyond February 1999.
 

 The plaintiff has alleged that at the communal printer that she used, she once found a print-out apparently regarding “The Life of a Slave” consisting of the following text: “Reading Incidents in the life of a slave made me realize just what being women in the south in the time of slavery would be like. The experiences [excerpt cut off].” (Rosenstein Decl. Ex. 1.) Even if this print-out were discovered sometime in March,
 
 [7]
 
 nothing in the excerpt itself is racially derogatory. Because it was sent anonymously to a communal printer shared by many workers, it is unclear that it was directed at the plaintiff by anyone with an intent to harass the plaintiff, or indeed anyone, on the basis of race.
 
 Cf. Alfano v. Costello,
 
 294 F.3d 365, 377-79 (2d Cir.2002) (discounting in sexual harassment case evidence of anonymous jokes or pranks not attributable to alleged harasser).
 

 Moreover, the print-out is relevant for statute of limitations purposes only if it is “an act contributing to the claim” of a racially hostile work environment.
 
 See Morgan,
 
 536 U.S. at 117, 122 S.Ct. 2061. The excerpt objectively could not have contributed to any alleged hostile work environment, nor could it have continued any alleged alterations of the conditions of the plaintiffs employment.
 
 See Alfano,
 
 294 F.3d at 373-74 (noting test that conduct “must be severe or pervasive enough to create an objectively hostile or abusive work environment” (internal quotation marks omitted)).
 

 The allegation with respect to Mr. Dromm is that one morning the plaintiff was telling a story about how a token-booth operator was rude to her. Mr. Dromm responded by asking the plaintiff whether she pulled a switchblade out on the booth operator, and the plaintiff felt that Mr. Dromm was insinuating that blacks carry switchblades.
 
 (See
 
 Pl. Dep. at 170-72.) Even assuming that this remark was made after March 8, 1999-al-though the plaintiff has not identified exactly when the remark was made-the comment is not on its face racially based.
 
 Cf. Alfano,
 
 294 F.3d at 376-77 (considering individual alleged incidents of harassment in summary judgment motion and distinguishing between comments that support harassment claim and comments that were unsubstantiated or “lack[ed] a linkage or correlation to the claimed ground of discrimination”). Moreover, this stray remark cannot be considered part of the ongoing pattern of conduct creating a hostile work environment. There is no discernable connection to the incidents involving Ms. Miller, and this lone statement does not come close to rising to the level of a sufficiently severe act
 
 *DXVIII
 
 of intimidation, ridicule, or insult that would alter the conditions of employment.
 
 See id.
 
 at 873-74;
 
 infra
 
 Part IV (explaining standard for showing harassment for hostile work environment claims).
 

 Without the print-out regarding “The Life of a Slave” or Mr. Dromm’s comment being included in the alleged pattern of harassment, the statute of limitations on the plaintiffs hostile work environment claim began running before March 1999. The plaintiffs state and local law claims for racial harassment are therefore time barred.
 

 C.
 

 In sum, the retaliation claims brought under state and local discrimination law are the only claims not time barred. The hostile work environment claims brought under state and local law are time barred. All of the federal claims are untimely because the plaintiff has presented no evidence to show that she satisfied the precondition for filing her EEOC charge in a timely manner. In any event, the hostile work environment and retaliation claims must also be dismissed on the merits.
 

 rv.
 

 Under Title VII, as well as under state and local law, the plaintiff must establish two elements to prove that she was subjected to a hostile work environment based on race.
 
 [8]
 
 First the plaintiff must demonstrate that the harassment was “sufficiently severe or pervasive to alter the conditions of [the victim’s] employment and create an abusive working environment.”
 
 Meritor Savings Bank, FSB v. Vinson,
 
 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (alteration in original) (internal quotation omitted);
 
 see also Harris v. Forklift Systems, Inc.,
 
 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993);
 
 Alfano,
 
 294 F.3d at 373;
 
 Hawana v. City of New York,
 
 230 F.Supp.2d 518, 532 (S.D.N.Y.2002). Second, the plaintiff must show a specific basis for imputing the hostile work environment to the employer.
 
 See Alfano,
 
 294 F.3d at 373.
 

 To satisfy the first requirement, which is the only one disputed by the defendant, the plaintiff must establish that “the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim’s employment.”
 
 Cruz v. Coach Stores, Inc.,
 
 202 F.3d 560, 570 (2d Cir.2000) (internal citations and quotations omitted);
 
 see also Thompson v. Am. Eagle Airlines, Inc.,
 
 No. 99 Civ. 4529, 2000 WL 1505972, at *6 (S.D.N.Y. Oct.6, 2000). “[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.”
 
 Cruz,
 
 202 F.3d at 570 (internal quotations and citations omitted);
 
 accord Whidbee v. Garzarelli Food Specialities, Inc.,
 
 223 F.3d 62, 69 (2d Cir.2000). The plaintiff must show both an objectively hostile work environment and that the plaintiff herself believed the environment to be hostile.
 
 Alfano,
 
 294 F.3d at 374 (quoting
 
 Harris,
 
 510 U.S. at 21, 114 S.Ct. 367). To determine whether the plaintiff has met this
 
 *DXIX
 
 burden, the Court will look at the totality of the circumstances including the severity, frequency, and degree of the abuse, whether it is physically threatening or intimidating, and whether it unreasonably interfered with the plaintiffs work performance.
 
 Id.
 
 (citing
 
 Harris,
 
 510 U.S. at 23, 114 S.Ct. 367);
 
 see also Schwapp v. Town of Avon,
 
 118 F.3d 106, 110-11 (2d Cir.1997);
 
 Hawana,
 
 230 F.Supp.2d at 532-33. Even on motions for summary judgment, courts conduct searching reviews of harassment allegations to determine whether the plaintiff has, as a matter of law, met “the threshold of severity and pervasiveness.”
 
 Alfano,
 
 294 F.3d at 376.
 

 Under all the circumstances, the plaintiffs allegations are insufficient to survive summary judgment. In commenting on the appearance and customs of African Americans, and in interjecting racially based anecdotes into her conversations with the plaintiff, Ms. Miller’s actions were racially ignorant, insensitive, and offensive. But the allegations do not suggest “that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered.”
 
 Alfano,
 
 294 F.3d at 373;
 
 see also Schwapp,
 
 118 F.3d at 110 (explaining that “a steady barrage of opprobrious racial comments” rather than “sporadic racial slurs” is required to sustain harassment claim (internal quotations omitted)). The plaintiff has described episodic, off-hand remarks that occurred over many months and are better characterized as “mere offensive utter-anee[s]” rather than “physically threatening or humiliating” conduct.
 
 Harris,
 
 510 U.S. at 23, 114 S.Ct. 367;
 
 see Alfano,
 
 294 F.3d at 374, 376 (stating that incidents must be continuous and concerted, rather than episodic, to be deemed pervasive). The comments generally were not personally insulting, nor were they obviously intended to intimidate, ridicule, or demean the plaintiff on account of her race.
 
 See Harris,
 
 510 U.S. at 21, 114 S.Ct. 367;
 
 Alfano
 
 294 F.3d at 376-77 (dismissing claim alleging twelve incidents of harassment and discounting fact that boss may be “harsh, unjust, and rude”).
 

 The actions by Ms. Miller, as alleged by the plaintiff, are insufficient to maintain hostile work environment claims against Citibank. The single remark allegedly made by Mr. Dromm, which had no connection to any actions by Ms. Miller and was not on its face correlated to any racial accusation, is insufficient to support or bolster the plaintiffs claims in any way. Similarly, the two-line excerpt about “The Life of a Slave” found on a communal printer was not itself racially derogatory and could not reasonably be viewed as contributing to a racially hostile atmosphere. Courts have dismissed claims as legally insufficient based on similar and even more egregious conduct than alleged in this case.
 
 See Alfano,
 
 294 F.3d at 379 (collecting cases). The defendant’s motion for summary judgment dismissing the plaintiffs claims for a hostile work environment based on racial harassment under Title VII, the NYSHRL, and the NYCHRL-Counts Four, Five, and Six of the Complaint-is therefore granted.
 

 V.
 

 The defendant also moves to dismiss the retaliation claims. Title VII prevents employers from retaliating or discriminating against an employee who has opposed an unlawful employment practice. 42 U.S.C. § 2000e-3(a). The standards for retaliation claims under federal, state, and local law are the same.
 
 See Coffey,
 
 2002 WL 1610913, at *5. To establish a
 
 prima facie
 
 case of retaliation, the plaintiff must demonstrate that (1) she was engaged in a protected activity; (2) the defendant was
 
 *DXX
 
 aware of this activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action, that is, a retaliatory motive played a part in the adverse employment action.
 
 See id.
 
 at *4.
 

 Under the familiar burden-shifting analysis in
 
 McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), once the plaintiff makes such a showing, the burden of production shifts to the defendant to put forth legitimate nondiseriminatory or nonretalia-tory reasons for its actions, at which point the plaintiff has the opportunity to demonstrate that the defendant’s explanations are false and that the retaliation and/or discrimination was a motivating factor in the adverse employment action.
 
 See, e.g., Van Zant,
 
 80 F.3d at 714. To survive a motion for summary judgment, the plaintiff is “obliged to produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge.”
 
 Id.
 
 (internal quotations omitted) (alteration in original).
 

 The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated or retaliated against the plaintiff remains at all times with the plaintiff.
 
 See Tex. Dep’t of Cmty. Affairs v. Burdine,
 
 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981);
 
 see also Reeves v. Sanderson Plumbing Prods., Inc.,
 
 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000);
 
 Fisher v. Vassar Coll.,
 
 114 F.3d 1332, 1336 (2d Cir.1997). The Court of Appeals for the Second Circuit has instructed that in determining whether the plaintiff has met this burden, a court is to use a “case by case” approach that evaluates “the strength of the plaintiffs prima facie case, the probative value of the proof that the employer’s explanation is false, and any other evidence that supports [or undermines] the employer’s case.”
 
 James v. N.Y. Racing Ass’n,
 
 233 F.3d 149, 156 (2d Cir.2000) (alteration in original) (quoting
 
 Reeves,
 
 530 U.S. at 148-49, 120 S.Ct. 2097);
 
 see also Schnabel v. Abramson,
 
 232 F.3d 83 (2d Cir.2000). Although summary judgment must be granted with caution in Title VII actions “where intent is genuinely in issue, ... summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact.”
 
 Chambers v. TRM Copy Ctrs. Corp.,
 
 43 F.3d 29, 37 (2d Cir.1994).
 

 The defendant argues that the plaintiff cannot show causation and that, even if a prima facie case can be made, the plaintiff cannot rebut Citibank’s legitimate nondiscriminatory reasons for terminating her assignment. The defendant first argues that there is no causation because the decision to terminate the plaintiff was made by Mr. Galligan, who had no knowledge of the plaintiffs complaints. Second, it argues that Mr. Galligan had a legitimate nonreta-liatory reason: He was mandated to cut costs, and the plaintiff was a highly compensated employee performing a function he found was not essential.
 
 (See
 
 Galligan Decl. ¶¶ 5-10.) The defendant contends that the plaintiff cannot show that this reason was false and that retaliation was a motivating factor for ending the plaintiffs employment with Citibank.
 

 A.
 

 Causation may be shown either directly, through evidence of retaliatory animus by the person who initiated the adverse action against the plaintiff, or indirectly, by showing that the retaliatory or discriminatory action was taken shortly after the protected activity or by showing
 
 *DXXI
 
 disparate treatment of other employees in similar circumstances.
 
 See Gordon v. N.Y. City Bd. of Educ.,
 
 232 F.3d 111, 117 (2d Cir.2000);
 
 Knight v. City of New York,
 
 303 F.Supp.2d 485 (S.D.N.Y.2004);
 
 Philippeaux v. Fashion Inst. of Tech.,
 
 No. 93 Civ. 4438, 1996 WL 164462, at *8-*9 (S.D.N.Y. Apr. 9, 1996),
 
 aff'd
 
 104 F.3d 356 (2d Cir.1996).
 

 The plaintiffs theory of causation is that Mr. Carter, the outgoing director of the Operations Group, arranged for the plaintiff to be terminated in retaliation for the plaintiffs accusations against Ms. Miller. The plaintiff was terminated April 20, 1999, approximately two months after she complained to Ms. Henley about Ms. Miller’s comments, and over one month after Ms. Miller had decided to resign as a result. Meanwhile, Mr. Carter, in his deposition, acknowledged that he disagreed with the charges against Ms. Miller and the action taken against her, and there are indications that Mr. Carter and Ms. Miller had a close working relationship.
 
 (See
 
 Carter Dep. at 41-43.) The plaintiff thus argues that there is direct proof of a retaliatory motive by a decisionmaker-namely, Mr. Carter-and indirect proof based on the temporal proximity between the plaintiffs complaints and the termination of her assignment.
 

 There is no evidence, however, showing that Mr. Carter was responsible for the plaintiffs termination. By the time the plaintiff was terminated from Citibank in April 1999, Mr. Carter had retired and the Group was being directed by Mr. Galligan, who stated that at the time he was unaware of any complaints made by the plaintiff and that he terminated the plaintiff to cut costs. None of the depositions or other evidence in the record suggest that anyone other than Mr. Galligan made the decision to terminate the plaintiff, and Mr. Galligan swears that he made that decision without consulting anyone else. (Galligan Decl. ¶ 8.)
 
 [9]
 

 The plaintiff asserts that an email exchange between Mr. Galligan and Ms. O’Connell on March 12, 1999 proves that the decision to terminate the plaintiff was made by Mr. Carter in March.
 
 (See
 
 Kraft Decl. Ex. 3) The record of the exchange, in its entirety, includes the two emails between Ms. O’Connell and Mr. Galligan that were “cc’ed” to the vice presidents of the Group, including Mr. Carter, Mr. Dromm, Mr. Harewood, and Ms. Miller, among others. On March 12, 1999 at 12:51 p.m., Ms. O’Connell wrote to Mr. Galligan:
 

 Richard — as agreed to with Jack yesterday — I have arranged to get a temp to file — she will begin on Monday afternoon and will be paid a lot! less than what we pay Paula.
 

 Paula — is dedicated to supporting me on Y2K. As I understand it all other required secretarial support will be provided by Audrey.
 

 Please let me know if I have misrepresented anything we discussed yesterday. Katy.
 

 (Id.)
 
 That same day, at 2:07 p.m., Mr. Galligan responded:
 

 Katy,
 

 I think you have represented everything as we discussed. Thanks for providing a value added solution.
 

 Richard
 

 (Id.)
 

 On their face, the emails involve getting a temporary clerical employee to do filing, and they reflect that the “temp” would not be paid as much as the plaintiff. But they do not indicate a decision to terminate the
 
 *DXXII
 
 plaintiffs assignment-an action that did not occur until well over a month after the exchange. In fact, the emails imply the plaintiffs continuing employment, as Ms. O’Connell plainly states that “Paula [] is dedicated to supporting me on Y2K.”
 
 (Id.)
 

 Testimonial evidence also undermines any assertion that the exchange involved a decision to terminate the plaintiff. Ms. O’Connell, the author of the main email, made it clear in her deposition that she was not involved in the decision to terminate the plaintiff, was informed of the decision by Mr. Galligan, and was upset that she lost the plaintiffs help.
 
 (See
 
 O’Con-nell Dep. at 74, 88-89, 101-03.) Mr. Hare-wood, who was included in the email exchange, also testified in his deposition that he did not participate in the decisionmak-ing process for terminating the plaintiff and that he was not informed of the reasons for that decision.
 
 (See
 
 Harewood Dep. at 34-35.) Mr. Carter testified that he has no recollection of the email exchange and was not involved in the plaintiffs termination, which, in his understanding, occurred after he retired.
 
 (See
 
 Carter Dep. at 23-26, 33-37.) The plaintiff has cited no evidence in the record to contradict the testimony by Ms. O’Connell, Mr. Harewood, and Mr. Carter.
 
 [10]
 

 The plaintiffs argument of causation is not supported by indirect proof of an alleged close temporal proximity between her protected activity and termination. “[T]emporal proximity alone is not necessarily dispositive of a causal connection,”
 
 Philippeaux,
 
 1996 WL 164462, at *9, and courts tend to find it sufficient only where the temporal proximity is “very close.”
 
 Clark County Sch. Dist. v. Breeden,
 
 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation omitted);
 
 Knight,
 
 303 F.Supp.2d at 497-498.
 

 The Court of Appeals for the Second Circuit has not set a bright-line test as to when a temporal link becomes too attenuated to demonstrate causation.
 
 See Hawana,
 
 230 F.Supp.2d at 530 (collecting cases). In this case, where the adverse action occurred two months after the plaintiffs protected activity, the temporal proximity itself is neither very close nor excessively attenuated.
 
 See Clark,
 
 532 U.S. at 273-74, 121 S.Ct. 1508 (citing cases where three- or four-month time span was insufficient to make prima facie case of causation);
 
 Hawana,
 
 230 F.Supp.2d at 530 (comparing cases where adverse action occurred twenty days or less after protected activity with case at hand, where protected activity occurred two years before alleged retaliation). But under all the circumstances of this case, the timing of the decision to terminate the plaintiffs assignment does not imply retaliation because
 
 *DXXIII
 
 the plaintiffs assignment was terminated after the people with an alleged retaliatory motive-namely, Ms. Miller and Mr. Carter-had left Citibank. See
 
 Philippeaux,
 
 1996 WL 164462, at *9 (finding that although temporal proximity was not itself too attenuated, in context, it did not suggest retaliation). Mr. Galligan, who made the decision to terminate the plaintiffs assignment has declared under oath that he was unaware of the plaintiffs complaints at the time of his decision. The plaintiff has not provided any basis for discrediting Mr. Galligan, and it simply makes no sense that Mr. Carter imposed a decision on Mr. Galligan, who then waited almost six weeks to carry out the plaintiffs discharge.
 
 See Knight,
 
 303 F.Supp.2d at 487-88 (criticizing claim where supervisors who allegedly retaliated against plaintiff were not in his group when underlying harassment and complaint occurred).
 

 The plaintiff, therefore, cannot state a prima facie ease for retaliation because there is no direct or indirect evidence connecting a retaliatory motive to the decision to terminate the plaintiffs assignment.
 
 See, e.g., Hollander v. Am. Cyanamid Co.,
 
 895 F.2d 80, 85-86 (2d Cir.1990) (finding no “causal nexus” where defendant allegedly wrote retaliatory letter to block plaintiffs application with prospective employer, but where prospective employer did not attribute its refusal to hire plaintiff to anything done by defendant);
 
 Philippeaux,
 
 1996 WL 164462, at *8-*9.
 

 B.
 

 Even if the plaintiff could state a prima facie case, the defendant has proffered legitimate, nonretaliatory reasons that the plaintiff has failed to rebut. Mr. Galligan has declared that he made the decision to terminate the plaintiff because of his mandate to cut costs. He stated that the plaintiff was a very highly compensated temporary clerical employee who did not provide any unique or essential skills.
 
 (See
 
 Galligan Decl. ¶¶ 5-8.) Moreover, in his understanding, the plaintiff was providing support primarily for Ms. O’Connell on the Y2K project, and Ms. O’Connell and the rest of the Group were being transferred to the offices in Connecticut.
 
 (Id.
 
 ¶¶ 4, 7.)
 

 The plaintiff has responded primarily by claiming that her job functions were more diverse than simply working for Ms. O’Connell and that she was never asked to resume working at her previous salary of $20.00 per hour.
 
 (See
 
 Hill Decl. ¶¶ 3-6.) But the plaintiff was a temporary employee whose primary function was ending, and her assignment was terminated against the backdrop of new management seeking to cut costs by, among other things, reducing personnel.
 
 (See
 
 Galligan Decl. ¶¶ 5, 8, 10). While the plaintiff cites deposition testimony that other temporary workers sat at the cubicle that the plaintiff had occupied
 
 (see
 
 Harewood Dep. at 45^46), there is no evidence that the plaintiff was replaced by another temporary employee who assumed the same or similar job functions.
 
 (See
 
 Galligan Decl. ¶ 10; O’Connell Dep. at 102-04 (testifying that she complained about plaintiffs absence and fact that she had “a lot of work to do on my own”).) Nothing contradicts the basic cost-cutting rationale, which is actually supported by the emails cited by the plaintiff
 
 (see
 
 Kraft Decl. Ex. 3.), nor is there any evidence that retaliation was a motivating factor behind Mr. Galligan’s decision.
 
 See, e.g., Van Zant,
 
 80 F.3d at 714 (affirming summary judgment dismissal where employer offered “valid, unrebutted reasons for its actions” and plaintiff “put forward nothing other than eonclusory allegations to suggest a causal relationship” between harassment complaints and negative evaluations or her termination);
 
 Pace v. Ogden Servs. Corp.,
 
 257 A.D.2d 101, 692 N.Y.S.2d 220,
 
 *DXXIV
 
 224 (App.Div.1999) (finding evidence of legitimate nondiscriminatory reason for plaintiffs discharge in case under NYSHRL, where employer investigated cost-cutting measures and decided to outsource work performed by plaintiff).
 

 The plaintiff cannot show a causal connection between her complaints and the termination of her assignment, and no 'reasonable jury could find that Citibank’s legitimate, nondiscriminatory reasons were not the true reasons for its actions and that retaliation was a motivating factor in the termination of the plaintiffs employment. Citibank’s motion for summary judgment dismissing the retaliation claims on the merits under federal, state, and local law is therefore granted.
 

 Conclusion
 

 For the reasons explained above, the motion for summary judgment dismissing all claims against the defendant Citibank is granted. The Clerk is directed to enter Judgment dismissing the Complaint and closing the case.
 

 SO ORDERED.
 

 [1]
 

 . While the plaintiff submitted a Statement of Material Facts Pursuant to Local Rule 56.1, the plaintiff's statement does not expressly accept or deny the allegedly undisputed facts presented by the defendant in its Rule 56.1 Statement. In fact, many of the plaintiff’s stated material facts are taken directly from the statement prepared by Citibank. Unless otherwise noted, citations to facts contained in Citibank’s Rule 56.1 Statement are deemed undisputed and accepted by the plaintiff.
 
 See
 
 Local Civil Rule 56.1(c) (stating that material facts will be deemed to be admitted unless controverted);
 
 Gubitosi v. Kapica,
 
 154 F.3d 30 31 n. 1 (2d Cir.1998).
 

 [2]
 

 . Because EEOC records were destroyed during the tragic events of 9/11/01, and because the plaintiffs EEOC charge was not dated, it is unclear when the EEOC charge was actually filed. The implications of the issue for the timeliness of the plaintiff's claims are discussed below.
 

 [3]
 

 . While the Rule 56.1 Statements by the defendant and the plaintiff state that the lawsuit “followed on March 7, 2002”
 
 (see
 
 Def.’s Rule 56.1 Stmt. ¶ 62; PL's Rule 56.1 Stmt. ¶ 34), it appears that the Complaint was signed and dated March 7, 2002 but was filed March 8, 2002.
 

 [4]
 

 . Generally, “Title VII requires a claimant to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action.”
 
 Van Zant v. KLM Royal Dutch Airlines, 80
 
 F.3d 708, 712 (2d Cir.1996). Because New York has its own antidiscrimination laws and enforcement agency, it is a “so-called deferral” state, and the 300 days limitation applies generally.
 
 Harris,
 
 186 F.3d at 247 n. 2.
 

 [5]
 

 . A related statutory time requirement is that once the EEOC issues a right to sue letter, the plaintiff has ninety days to bring suit. 42
 
 *DXV
 
 U.S.C. § 2000e-5(f)(l). There are no claims that the plaintiff failed to comply with this requirement.
 

 [6]
 

 . The defendant’s Answer to the Complaint denied knowledge sufficient to confirm or deny the allegations in paragraph 2 of the "Jurisdiction” section of the Complaint, which averred that the Complaint was filed within 90 days of the issuance of the right to sue letter.
 
 (See
 
 Answer ¶ 3; Compl. Jurisdiction ¶ 2.) Although the Answer did not deny specifically and with particularity that the EEOC charge was filed within 300 days, the plaintiff never alleged that this condition precedent was satisfied. Furthermore, the Answer asserted as an Affirmative Defense that "the Complaint is barred, in whole or in part, because Hill has failed to satisfy all jurisdictional prerequisites.” (Answer ¶ 27.) The defendant, therefore, properly put the satisfaction of the precondition at issue and has made the argument in detail in the motion for summary judgment.
 

 [7]
 

 . In her declaration submitted for the motions for summary judgment, the plaintiff stated that she discovered the excerpt after she complained to Human Resources about Ms. Miller. (Hill Decl. ¶ 8.) In her deposition she stated that she found the print-out while at work on a holiday. (PL Dep. at 213.)
 

 [8]
 

 . The standards for harassment claims under Title VII and New York’s Human Rights law are, for purposes of this case "essentially identical.”
 
 Van Zant,
 
 80 F.3d at 715;
 
 see also id.
 
 at 715-16 & nn. 5, 6;
 
 Coffey,
 
 2002 WL 1610913, at *5. While the standards for hostile work environment claims have largely been developed in the context of sexual harassment, the Supreme Court has sought "generally to harmonize the standards of what amounts to actionable harassment” based on sex and race.
 
 See Faragher v. City of Boca Raton,
 
 524 U.S. 775, 787 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).
 

 [9]
 

 . The plaintiff’s citations do not support any contention that Mr. Carter was responsible for terminating the plaintiff.
 
 See infra
 
 note 10.
 

 [10]
 

 . The plaintiff's Rule 56.1 Statement does not accurately represent the testimony of Mr. Carter in citing his deposition for the allegation that "On or about March 11, 1999, Jack Carter informed Kathleen O’Connell he decided to fire Ms. Hill."
 
 (Compare
 
 Pl. Rule 56.1 St. ¶ 39,
 
 with
 
 Carter Dep. at 33-34.)
 

 In addition, the plaintiff overreaches in claiming that Mr. Carter, during his deposition, "stated ‘It was possible' he made the decision to let Ms. Paula Hill go.”
 
 (See
 
 Pl.'s Rule 56.1 Stmt. ¶ 40.) When asked specifically whether he was “involved in the decision that led to Ms. Paula Hill no longer working at Citibank," he testified, "No.” (Carter Dep. at 23.) In response to other questions, Mr. Carter reiterated that he was not involved in the decision leading to the plaintiff's termination from Citibank because he had retired (Carter Dep. at 23, 25), and that it was "highly unlikely” that he would have been involved in any decision to terminate the plaintiff
 
 (id.
 
 at 36). In response to one question, Mr. Carter accepted the possibility that he could have been involved in such a decision because he did not remember anything related to it.
 
 (Id.
 
 at 35.) But he never stated that it was possible that he made the decision, and the inability to exclude a speculative possibility is not evidence.